**LORETO COMPANIA NAVIERA, S.A.,**
**as Owner of the SS LAMYREFS,**
**Appellant,**

v.

**BRADLEY AND BAKER and Centraal**
**Stikstof Verkoopkantoor, N.V.,**
**Appellees.**

No. 22642.

United States Court of Appeals
Fifth Circuit.

Oct. 28, 1966.

Rehearing Denied Oct. 9, 1967.

John H. Tappan, Mobile, Ala., Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., of counsel, for appellant.

Charles Kohlmeyer, Jr., Lemle & Kelleher, New Orleans, La., for appellees.

Before JONES and COLEMAN, Circuit Judges, and JOHNSON, District Judge.

COLEMAN, Circuit Judge.

In this appeal we must settle the liability of a cargo owner in consequence of two charter contracts, conflicting in various material stipulations, the second of which the cargo owner did not sign, for the use of a vessel to transport a cargo of fertilizer from Rotterdam to American Gulf ports. Under the facts which are to be discussed, the District Judge declined to hold either the owner, or the cargo, to any greater liability than that assumed in the first charter. We affirm.

There is little dispute, if any, about the material facts. The District Court made careful, thorough findings and these findings are amply supported in the evidence. The issue, contested with skill and energy by counsel on both sides, revolves around the legal consequences of those facts.

On September 21, 1961, Tramontane (Bahamas) Ltd., hereinafter referred to as Tramontane, did not own the SS Lamyrefs. So far as this record shows, it did not own any vessels at all, nor was it a party to this litigation.

Centraal Stikstof Verkoopkantoor, N. V., hereinafter referred to as Centraal, wanted to ship not less than 9,500 metric tons of Nitro lime in bulk, as above mentioned.

On September 21, under a form of charter which was regular in all respects and executed on the Baltic Exchange in London, Centraal chartered from Tramontane the SS Lamyrefs, or a substitute vessel, to carry the cargo.

For the purpose of discharging its charter obligation to Centraal, Tramontane, on October 5, 1961, entered into a second charter with Loreto Compania Naviera, S.A., appellant, hereafter referred to as Loreto, a Panamanian owner of the Liberian Flag Vessel, SS Lamyrefs, for the transportation of the same cargo to the same destination.

For clarity, we shall refer to the charter of September 21 as the first charter and that of October 5 as the second charter. Centraal was not a party to nor was it a signatory to the second charter. Of course, Loreto was not a party to nor a signatory to the first. All parties, however, had actual notice of the existence, if not all details, of both charters before the SS Lamyrefs sailed from Rotterdam.

The two charters contained conflicting stipulations in the following material particulars:

FREIGHT

First charter, $4.75 per ton and $.25 extra per ton to the second discharged cargo, if a second port was used. Seventy-five percent of the freight to be paid within five days after signing bills of lading and the remaining 25% on delivery of cargo.

Second charter, lump sum freight $42,000, with an additional $2,000 if there was a second port of discharge. Payable 80% on signing the bills of lading and the balance before breaking bulk at the first port of discharge.

## NOTICE OF ARRIVAL FOR LOADING

First charter, ten days notice for benefit of Centraal.

Second charter, none specified.

## RATE OF LOADING

First charter, 1,000 metric tons per twenty-four hour working day, or 9½ days for 9,500 tons.

Second charter, fourteen working days of twenty-four consecutive hours.

## DISCHARGING

First charter, same as for loading.

Second charter, omitted.

## DISPATCH and DEMURRAGE

First charter, $600 per day, or pro rata, dispatch.

$1200 per day demurrage.

Second charter, $450 per day, or pro rata, dispatch.

$900 per day, demurrage.

After the cargo was loaded, agents of the interested parties met on board the Lamyrefs. The master of the Lamyrefs refused to sign bills of lading pursuant to the first charter, which called for payment of 75% of the freight. Centraal declined to pay the 80% required in the second charter. The master did sign bills of lading under the terms of the second charter but placed them in the hands of his own agents to be delivered on payment of the 80%. Tramontane agents did sign and deliver to Centraal bills of lading under the September 21 charter, but Loreto was not a party to that contract. The District Judge held, correctly we think, that under these facts no bills of lading were issued and thus we do not here have any contract by bill of lading.

Before the Lamyrefs arrived at Gulfport, Mississippi, Loreto had received a freight payment from Tramontane in amount of $29,392.27. In accordance with the September 21 charter, Centraal had previously made deposits to the credit of Tramontane totaling $29,688.50.

Because the amount which Loreto received was far less than the $42,000 which it claimed it was entitled to under the October 5 charter, Loreto refused to permit discharge of the cargo when the ship arrived in Gulfport, on November 2, 1961. Only after Centraal hired its own stevedores, obtained a court order, and posted a bond as security to protect Loreto's asserted liens on the cargo was the cargo unloaded. The Mobile portion of the cargo was allowed to proceed and be discharged by agreement of the parties.

Centraal filed suit against Loreto, claiming damages incurred by reason of Loreto's refusal promptly to discharge the cargo. Loreto then filed suit claiming freight and other compensation in accordance with the provisions of the second charter.

The District Court held that Loreto had no lien on the cargo because it had no charter contract with Centraal and had not issued bills of lading to Centraal. We consider it unnecessary to reach the lien question because Centraal repeatedly expressed its willingness to pay Loreto all sums lawfully owed it, so stipulated in Court, and did promptly pay the sum of $4,746.78 which the District Court found was owing to Loreto under the terms of the first charter.

As to whether the terms of the first charter or the second charter were to prevail, the District Judge held that he was

"unable in effect to re-write the commitment which Centraal made for the transportation of its fertilizer, and that the terms of the September 21 charter are those under which the rights of the parties must be resolved. I recognize that this holding, in effect, precludes the recognition of the October 5 charter, but Loreto saw fit to put its vessel into the channels of trade on the faith of the credit of Tramontane, and hence it must look to Tramontane for the enforcing of its contract. It may not apply the terms of its charter to Tramontane to the movement of the Centraal cargo".

At another point in its findings of fact and conclusions of law, the District Court held "* * * neither Loreto nor Centraal could be held bound by the terms of the other party's contract to which it was not a signatory".

The District Court further held,

"In all of the cases cited by Loreto, there was a contractual relationship between the owner of the cargo on which the lien was sought to be imposed and the owner of the ship seeking to collect its freight. In all cases, bills of lading and/or other documents were issued by the ship and accepted by the cargo owner, wherein reference was made to the charter, and the terms of the latter were incorporated into the former. Such an arrangement binds cargo to the ship owner, even though the cargo owner is not directly in privy with the ship owner."

*   *   *   *   *   *

"The Court cannot make a new contract for the owner of cargo and can only hold him for what he agreed to pay for the carriage of his cargo."

*   *   *   *   *   *

"I can find no authority for charging Centraal with a liability greater than that assumed by it in its contract and I have concluded that it would be obviously improper for me to do so".

As the District Court pointed out, the case appears to be one of novel impression. We entertain no doubt, however, that the issues were correctly decided.

■ It is settled that the charters here involved were *simply maritime contracts,* and as to those signatories who were before the Court there was jurisdiction to determine the obligations arising therefrom, 1 Am.Jur., Admiralty, Section 35.

■ That being true, Loreto had the option, when it learned of the first charter, of declining to transport the fertilizer, holding Tramontane for its damages, if any, and leaving Centraal to do likewise. Under fundamental rules of contract law, Loreto could not elect to hold Centraal to the terms of a contract it had not made and which Tramontane had no authority to make for it.

There were various issues as to liability for dispatch, demurrage, advances, and other like items. These were matters of simple accounting under the terms of the charter and we are of the opinion that all of these questions were correctly resolved by the District Court. It is unnecessary that they should be rehashed here.

Affirmed.

### ON PETITION FOR REHEARING

Full consideration of the petition for rehearing has prompted no change in our disposition of the controlling issue in this controversy. Under the facts, we held that the charter of September 21, not the one of October 5, defined the liability of the cargo owner. We adhere to that view. The gist of it is simply that Tramonte, already under contract to Centraal, without the prior authority or subsequent ratification of that cargo owner, could not bind Centraal in a second contract calling for freight in excess of that already agreed upon.

In its petition for rehearing appellant says, "The conclusion of this Court, if allowed to stand, will be in direct contradiction of and conflict with the principles long accepted and recognized by the courts * * *".

The Court, of course, has no desire to stand in that questionable position, and the fact remains that appellant has not come forward with any case, nor have we been able to find one, contrary to the principle above announced.

It is true that appellant, in its original brief, relied very strongly on The Solhaug, 2 F.Supp. 294 (S.D.N.Y., 1931). The case was not discussed in the original opinion because we did not find it to support appellant's contentions. From a careful analysis of the opinion in that case it does not appear that the vessel owner was claiming or that the court allowed recovery in excess of amounts

originally contracted for by the cargo owner.

Nor did we intend to infer that Loreto might not have a lien on the cargo to the extent of the amount contracted for on September 21. That was not the issue. Loreto claimed a lien to the extent of the contract of October 5, a contract not binding on Centraal. As the District Judge found, that was the contention which caused the entire litigation.

Exception has been taken to our failure to repeat and analyze the extensive findings of fact of the district court as to liabilities for dispatch, demurrage, advances, interest, and other like items. It must be remembered that we are here dealing with two suits. In one, Centraal sued Loreto for its refusal to permit the vessel to commence discharging the cargo at Gulfport. Loreto proceeded in rem against Centraal for full payment under the terms of the charter party of October 5, 1961. The Judge hit the nail on the head when he found that "The parties are hopelessly at odds as to the legal theories to be applied under the facts presented". The Judge made detailed and exhaustive findings which occupied twenty six pages in the duplicated record. This will not be repeated other than to point out that he began by allowing the appellant the full sum of $48,275 for freight due under the charter of September 21. He credited Centraal with the sum of $29,688.50 paid on account, which Loreto does not deny receiving. He likewise credited Centraal with other sums expended on behalf of the ship at Rotterdam, Gulfport, and Mobile. He credited other items for dispatch, trimming, and expense of gangs and equipment ordered out at Gulfport but not used because of the refusal of Loreto to permit the unloading to commence until it should be paid the amount claimed under the contract of October 5. After doing this, he found a balance due Loreto in the amount of $5,547.42, for which he gave judgment. His findings have strong support in the evidence and we again decline to disturb them.

While it is true of course under the usual situation that in the case of sub-charters the vessel owner with a lien clause has a lien against the cargo to the extent of the amounts due by cargo to the sub-charterer, this lien is, as stated, only to the extent that the sub-charter has a lien. Clause 8 of the September 21 Charterparty does afford a lien to the sub-charter Tramonte. But under the special typewritten addenda which supersedes the printed clauses on ordinary principles of contract construction, the lien reserved by Tramonte was modified as to the 25% remaining due on the freights. It had a right to pursue the cargo after "delivery" but it did not have a possessory right to retain the cargo to assert or effectuate a lien which was conditioned upon "right and true delivery of the whole cargo". Consequently, although the shipowner is entitled to recover the balance due of the remaining 25% unpaid freight as the cargo is willing to pay and the judgment so provides, the ship did not have the right to assert either a possessory or contractual lien against the whole cargo at the port of discharge. Consequently the expenses incurred by the cargo from that delay are chargeable to the shipowner and are recoverable by the cargo.

Quite apart from any question concerning the issuance or nonissuance of the bills of lading which we now regard as substantially irrelevant if not altogether immaterial, the facts concerning the knowledge of the existence of the October 5 Charterparty were not such as to compel the Court to find that there had been a novation as between the cargo and the shipowner which would in effect supersede the Charter of September 21. This meant that the shipowner's right against the cargo under its reserved lien was limited to whatever rights the sub-charter Tramonte had against the cargo under its lien clause. The bills of lading did not add to or detract from this. Under the judgment the shipowner gets the full benefit of everything which the sub-charter Tramonte could recover against the cargo.

The shipowner succeeds completely to the lien and to the contractual right of recovery of Tramonte against the cargo in excess of the lien. To this extent of course the law in effect does accord vitality to the second Charter of October 5 to which the cargo literally was not a party. But it does so only in terms of the amounts (and method) of payment due by cargo under the Charter of September 21.

The petition for rehearing is

Denied.